UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| SCEAUNCIA PARR, individually and as next friend of W.C.P., a minor; and W.C.P., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>LYNCHBURG CITY SCHOOL BOARD,<br><br>Defendants. | Case No. 6:26-cv-95 |

**LYNCHBURG CITY SCHOOL BOARD'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff W.C.P. is a rising senior at E.C. Glass High School. Last year, he was on E.C. Glass's lacrosse team. Days before a rivalry match against neighboring Jefferson Forest High School, he took it upon himself to compile information for "trash talk" about players on Jefferson Forest's team and others connected with it, wrote it all down in a list, and, during school, posted it on Snapchat and sent it to friends at Jefferson Forest.

Some statements W.C.P. made were beyond the pale. His list was shared more widely. Numerous parents of impacted students complained, believing the list showed Jefferson Forest players would be subjected to harrassment at the game. E.C. Glass and Lynchburg City Schools administrators determined the next day's game had to be forfeited as a result. Two more games required greater security measures, including a greater Lynchburg Police Department presence, and security planning to reduce risk of any altercation between the teams, students, or families.

E.C. Glass's Principal spoke to W.C.P. and gave him the chance to explain what happened. W.C.P. admitted to the conduct. The Principal then issued a short-term (ten-day)

suspension and set a hearing of the Disciplinary Committee of the Lynchburg City School Board to consider a long-term suspension. W.C.P. and his mother, the Plaintiffs here, arrived, spoke on his behalf, and submitted a half-dozen letters of support. The Disciplinary Committee considered it, and imposed a 90-day suspension.

Plaintiffs' eleventh-hour request for emergency relief from this Court identifies no constitutional violation or legal flaw in the Disciplinary Committee's decision or conduct. Absent that, the decision of Lynchburg's local government body charged with considering and dispensing substantial discipline in the school district is entitled to deference, and Plaintiffs' motion should be denied.

<u>Background</u>

1. *W.C.P.'s Misconduct, and Its Impact on His Team, School, Community.*

On May 5, 2026, two days before a long-time rivalry match between his E.C. Glass High School lacrosse team and Jefferson Forest, Plaintiff W.C.P., a junior on Glass's team, decided to compile, write, and circulate a list of "JF chirps" about the Jefferson Forest team and students that were associated with it. Ex. 1. "Chirps" are slang for "trash talk."[1] W.C.P.'s chirp list identified J.F. players by name and jersey number. It included that one specific J.F. player "[redacted]." For another, W.C.P. wrote "[redacted]." And for another on the list, W.C.P. wrote that somebody "[redacted]." There are others. <u>See</u> Ex. 1.

W.C.P. admits that he wrote the list during class; that he gathered the comments that went into it; and that he used his cell phone to post it on Snapchat and send it to three of his friends at

[1] *Chirp*, <u>Merriam-Webster</u>, https://www.merriam-webster.com/dictionary/chirp (last visited Aug. 15, 2026) ("informal: to make sharply critical, complaining, or taunting remarks," citing example: "Emotions boiled over for Panthers quarterback Cam Newton and cornerback Josh Norman after the two <u>chirped</u> at each other constantly for two weeks.").

Jefferson Forest. See Ex. 2, LCS Director Student Services Sumner Decl. at PDF 14, 18 ("Sumner Decl."). A recipient of the list from W.C.P. at Jefferson Forest apparently shared it with others at the school, some of whom then sent it to the parents of the named J.F. students/players on the list. Id. W.C.P. says he did not want the list to be shared beyond his three friends he sent it to. Id. More on that later. See infra p. 17 n.8

By writing this list, posting it on Snapchat and sharing it with others, W.C.P.'s actions had a direct and harmful impact on those Jefferson Forest students/players named on the list, their families and others in the Jefferson Forest community, as well as to his school, E.C. Glass and its lacrosse team. The next morning (May 6), the first of many parents of the Jefferson Forest students/players on W.C.P.'s chirp list began communicating with Lynchburg City Schools ("LCS") Adminstration offices by phone and/or contacting E.C. Glass's then-Principal Daniel Rule, to express their concerns about the list. See Ex. 3, LCS Deputy Superintendent Decl. ¶ 5 ("Davis Decl."). They believed that it was an effort by the E.C. Glass boys' lacrosse team to intimidate J.F. players at the game with targeted "chirps" about [redacted]—well beyond customary "trash talk." Id. They also expressed concern about the players' safety, if the next day's match were to unfold as planned. Id. LCS Administration determined that W.C.P.'s chirp list and the fallout had enflamed tensions between the E.C. Glass and Jefferson Forest lacrosse teams, students and families to such an extent that the May 7, 2026 match had to be postponed. This match was not rescheduled and ultimately treated as "forfeited."[2] Id. ¶ 6.

As E.C. Glass and the LCS Administration began to learn, W.C.P.'s chirp list and its circulation had a significant harmful impact on others. [redacted]

[2] That this game was "forfeited" negatively impacted the E.C. Glass boys' lacrosse team's record and meant loss of home-field advantage in the boys' lacrosse regional semi-finals.

[redacted]. Id. Others were impacted as well. Id.

While the E.C. Glass and Jefferson Forest girls' lacrosse match was held the following week (May 13), these stakeholders determined that the match required an increased security presence (three Lynchburg Police Department or "LPD" officers, instead of one, as customary), additional supervision from school administrators and athletics staff, and detailed procedures to ensure pre- and post-game separation for the teams, each school's students and other spectators. Id. ¶ 8.

The E.C. Glass and Jefferson Forest boys' lacrosse teams played two weeks later in the regional semi-finals on May 27. The administrations of E.C. Glass and Jefferson Forest had to participate in a much greater degree of coordination and detailed pre- and post-game planning than is typical, to ensure a safe and uninterrupted match. Id. ¶ 9. Administrators of each school met with the lacrosse players and their families before the match to communicate behavioral expectations and contest procedures; arrival and departure procedures for each team and their supporting fans were put into place and followed. Id.

2. *Disciplinary Process Afforded to W.C.P.*

On May 6, 2026, when LCS and Principal Rule had learned of W.C.P.'s chirp list, Principal Rule and LCS Director of Student Services Dr. Christopher Sumner went to speak to

W.C.P., showed him a printout of the list, and gave him the opportunity to tell his side of the story. W.C.P. did so, and, in his own words, put it in writing in two separate statements given to Principal Rule that day. See Ex.2-B, Sumner Decl. at PDF 12–14, 17–18 (W.C.P.'s handwritten statements and subsequent typed version).

Later that day, Principal Rule submitted a Behavioral Detail Report imposing a 10-day, short-term suspension for W.C.P., describing in the "incident details" that W.C.P. had "posted an inappropriate snapchat post during class and sent it to a group of friends at another school." The report included the following further description of the event:

> [W.C.P.] shared that he posted a picture, which was a list of JF lacrosse players names, on Snapchat and sent to a group of friends. This post included many comments next to player names like, "[redacted]", "[redacted]", "[redacted]" (the picture is attached). The post was shared beyond the group of friends and was seen by other students as well as adults in the community. The impact of this post has involved resources beyond the school (like Lynchburg Police Department) to ensure the safety of the environment of an upcoming game between the two schools.

Sumner Decl. ¶ 4; Ex. 2-A. The Report cited "possession or use of portable communication devices in violation of scohol policy." Id. And it included information about how the student through his parent/guardian could seek review of the decision. Id.

On May 7, 2026, LCS sent Plaintiff Sceauncia Parr, W.C.P.'s mother ("Ms. Parr"), the Behavior Detail Report and a Notice of Long-Term Suspension Recommendation. Sumner Decl. ¶¶ 4–7 & Exs. 2-A, 2-B. This included as a "Summary of Incident" the same language block-quoted above. It identified that the Principal was recommending to the School Board that it consider imposing a long-term suspension of W.C.P. of up to 364 days and placement in alternative education. Sumner Decl. Ex. 2-B at PDF 8–11. The Notice of Long-Term Suspension Recommendation packet included the Behavior Detail Report, W.C.P.'s chirp-list, two handwritten statements W.C.P. had provided to Principal Rule, a form for "student/parent due

process rights" concerning short-term suspensions, a list of discipline codes, and other information about W.C.P.'s discipline and academic record. Id. Ex. 2-B.

On May 11, 2026, Ms. Parr was notified by phone conversation and a Google calendar invite that the School Board Discipline Committee hearing for W.C.P. was going to be held on May 14, 2026. Sumner Decl. ¶ 9; Ex. 4, LCS Chief Operating Officer Decl. ¶ 4 ("Marshall Decl."). At the May 14 hearing, W.C.P. and his mother attended. Each were afforded the opportunity to, and did, speak on his behalf, and were able to speak as long as they wished. Marshall Decl. ¶¶ 7–8. While W.C.P. would have been permitted to bring additional evidence, witnesses, or other persons to speak on his behalf, he did not avail himself of that opportunity. Id. ¶¶ 9–10. W.C.P. did, however, secure five character reference letters, which he submitted to and which were considered by the Discipline Committee. Id. ¶ 10; see also Sumner Decl. ¶ 10 & Ex. 2-D (letters).

The Discipline Committee, after considering the materials before it, W.C.P.'s and his mother's remarks on his behalf, and the letters in support, determined that W.C.P. would be suspended for 90 days, receive Home Educational Services, and that he could return to E.C. Glass on December 14, 2026. Ms. Parr and W.C.P. were informed of that decision the day after the hearing. See Sumner Decl. ¶¶ 10–12 & Ex. 2-C.

## Procedural Posture

On July 2, 2026, Plaintiffs (Ms. Parr and W.C.P.) brought this suit against the City of Lynchburg School Board in the Circuit Court for the City of Lynchburg, claiming his 90-day suspension was a violation of his procedural due process rights under the Fourteenth Amendment to the U.S. Constitution, as well as a violation of the Virginia Constitution and statutes. Dkt. 1-1

(Complaint). Plaintiffs served the Defendant School Board on July 14, 2026. Dkt. 1 ¶ 6. (Notice of Removal).

On August 4, 2026, the School Board removed this case to Federal Court, and that day, filed a motion for a ten-day extension of time to respond to the Complaint, which was granted. Dkts. 2, 4. The School Board's answer or motion to dismiss is due on August 21.

On August 13, 2026—forty-two (42) days after Plaintiffs filed their Complaint, and ninety (90) days after the Discipline Committee imposed the 90-suspension on W.C.P.—Plaintiffs filed their Motion for Preliminary Injunction and Temporary Restraining Order or TRO, seeking an "Emergency Injunction" from the Court within two (2) business days, by August 18. Dkt. 7. The Court set a hearing for August 17 at 1:00 p.m., and allowed the School Board to file an opposition by that morning. Dkts. 9, 10.

## Legal Standard

To establish an entitlement to emergency relief including a temporary restraining order or TRO, the plaintiff bears the burden to establish all of the following: (1) a likelihood that plaintiff will succeed on the merits, (2) a likelihood of irreparable harm to the plaintiff if the TRO is denied; (3) the balance of equities favors entry of the TRO; and (4) the public interest supports issuing the temporary restraining order. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Henderson for NLRB v. Bluefield Hosp. Co., 902 F.3d 432, 439 (4th Cir. 2018) ("Winter made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief.").

Of course, a TRO is "an extraordinary remedy," which "may be awarded only upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22 (emphases added).

The Standard for Emergency Relief Is Decidedly Not Met

Plaintiffs cannot satisfy any, much less all, of the requirements for an award of interim, emergency relief they seek to displace the School Board's Disciplinary Committee's decision. Their request for a TRO must be denied.

1. *W.C.P. Is Not Likely to Succeed on the Merits.*

Plaintiffs' main claim is that the School Board deprived W.C.P. of procedural due process under the Fourteenth Amendment to the United States Constitution, violating 42 U.S.C. § 1983. The applicable legal standard for the claim is not in dispute. While students facing suspensions from school of ten days or less "must be given some kind of notice and afforded some kind of hearing," longer suspensions "may require more formal procedures." Goss v. Lopez, 419 U.S. 565, 579, 584 (1975); R.M.B. v. Bedford Cnty. (Va.) Sch. Bd., 169 F. Supp. 3d 647, 655 (W.D. Va. 2016) (quoting Goss). Other Circuits and courts within the Fourth Circuit have held that "students facing long-term suspensions must be given notice and a meaningful opportunity to be heard." R.M.B., 169 F. Supp. 3d at 655; Plaintiff A v. Park Hill Sch. Dist., 97 F.4th 586, 590–91 (8th Cir. 2024) (same). W.C.P. was afforded both.

a. W.C.P. Was Afforded Notice and Meaningful Opportunity to be Heard

First, W.C.P. was "sufficiently notified of 'what [he was] accused of doing and what was the basis for the accusation.'" See Park Hill Sch. Dist., 97 F.4th at 591 (quoting Goss, 419 U.S. at 582). W.C.P. and his mom received written notice of the initial ten-day suspension; they were notified about Principal Rule's recommendation of the long-term suspension (of up to 364 days); they were notified with the "Summary of the Incident" quoted above and describing the "inappropriate snapchat post" W.C.P. wrote, sent, and shared with others; they were given the accompanying evidence providing the basis of the recommended long-term suspension that

would be considered by the Disciplinary Committee (including W.C.P.'s chirp list and written statements to Principal Rule), as well as other materials concerning his record and rights; and they were given notice of the Disciplinary Committee hearing. See Sumner Decl. ¶¶ 4–8 & Exs. 2-A, 2-B.

Second, W.C.P. was afforded a meaningful opportunity to be heard. More than one, in fact. On the day of the incident, W.C.P. spoke with Principal Rule, Dr. Sumner, and LCS' Athletics Coordinator, and gave them his version of events—acknowledging that he compiled the information in the "chirp list," admitting he sent it, explaining his reasons for doing so, and offering mitigating statements that he had not meant it to be disseminated further. W.C.P. then provided them with written statements describing what had happened. See Sumner Decl. Ex. 2-B at PDF 12–14, 17–18; see also Park Hill Sch. Dist., 97 F.4th at 591 ("Plaintiffs received multiple opportunities to explain their version of the facts," including recounting "their versions of the events at their initial meetings" with the principal and then "providing a written statement" about their involvement in the incident) (cleaned up). At the Disciplinary Committee hearing, W.C.P. attended and spoke on his behalf, as did his mom. Marshall Decl. ¶¶ 7, 8. They were given no time restrictions and spoke as long as they wished. Id. W.C.P. was also given the opportunity to present evidence or bring others to speak on his behalf, and while he did not do that, W.C.P. did submit a half-dozen character letters that were considered by the Board. Id. ¶¶ 9, 10; Sumner Decl. ¶ 11 & Ex. 2-D. This was certainly a "meaningful opportunity to be heard." See R.M.B., 169 F. Supp. 3d at 655; Park Hill Sch. Dist., 97 F.4th at 591.

b. W.C.P.'s Contrary Arguments Have No Merit

Plaintiffs do not and cannot contest those facts about his receiving notice and the hearing he was afforded. Instead, they argue that Virginia law and School Board policy prohibited

suspending W.C.P. at all, or that he could not be suspended for more than 45 days, or that the notice he received of the charges against him was so deficient that it constituted something like a per se procedural due process violation. These arguments have no merit.

Plaintiffs argue that Virginia Code § 22.1-79.3:1 prohibits the suspension at issue. See Dkt. 8 at 2, 6–9. It does not. While the statute does prohibit suspension or expulsion for mere "possession" or "use" of a "cell phone and smart device" when "prohibit[ed] … on school property," id. § 22.1-79.3:1(B)(1), (5), the statute expressly carves out an exception to this general rule for "[a]ny violation of any such student cell phone and smart device possession and use policy that involves, coincides with, or results in an instance of disruptive behavior . . . ." Va. Code § 22.1-79.3:1(C) (emphasis added).[3] The Code further defines "disruptive behavior" as "a violation of school board regulations governing student conduct that interrupts or obstructs the learning environment." Id. § 22.1-276.01(A). This is precisely the conduct for which W.C.P. was suspended—using a cell phone to cause a material disruption in the school environment. There was no violation of Virginia statute or School Board policy.

Plaintiffs' backup argument fares no better. Plaintiffs claim that he could not be suspended for any more than 45 days unless "the school board … [found] that aggravating circumstances exist." Dkt. 8 ("Mot.") at 9–10. They assert that the Board made no finding of aggravating circumstances, Compl. ¶ 28, but that is a legal conclusion to which no deference is owed,[4] and which need not be credited to the exclusion of all other evidence. Here, there was

[3] See also Va. Code § 22.1-79.3:1(C) (stating that no violation of cell phone and smart device "possession and use policy … shall alone constitute sufficient cause for a student's suspension or expulsion") (emphases added).

[4] See, e.g., Vitol, S.A. v. Primerose Shipping Co. Ltd., 708 F.3d 527, 548 (4th Cir. 2013) (disregarding conclusory allegations and "legal conclusions couched as factual allegations" from verified complaint when ruling on its legal sufficiency).

ample factual basis for the finding and existence of "aggravating circumstances," which include when "a student engaged in misconduct which caused serious harm (including but not limited to physical, emotional, and psychological harm) to another person(s)." Ex. 5 (Va. Dept. of Educ. Memo #291-18, Definition of "Aggravating Circumstances" (Oct. 18, 2018)) (emphases added). The impact and harm is evident from the facts underlying the charge, which Plaintiffs did not contest before the School Board. Plaintiffs have no argument for why these facts do not constitute aggravating circumstances.

Finally, Plaintiffs claim they were not afforded procedural due process. They argue that "[t]he Board gave W.C.P. notice of one charge, a cell phone policy violation, then imposed a ninety-school-day policy intelligible only by reference to the content of his communications." Mot. at 10. That, they contend, was conduct W.C.P. "was never charged [with] and which he had no opportunity to defend," and that punishing him for uncharged conduct was a procedural due process violation. Id. at 10–11.

This is an after-the-fact, litigation-driven argument that W.C.P. and his mom never raised to the Disciplinary Committee. And for good reason. They never had any doubt (either W.C.P. or his mom), from W.C.P.'s first interaction with Principal Rule Dr. Sumner and LCS' Athletics Coordinator on May 6 forward, that it was the content of his cell phone communication (his "chirp" list), as well as the disruption it caused to his team, school, and community, that formed the basis for the charge—and not the mere use of a phone during school hours when prohibited. The Behavior Detail Report and the Notice of Long-Term Suspension Recommendation described the communication, and its substantial effects on the community—quoted in full above—"This post was shared beyond the group of friends and was seen by other students as well as adults in the community. The impact of this post has involved resources beyond the

school (like Lynchburg Police Department) to ensure the safety of the environment of an upcoming game between the schools." Sumner Decl. Exs. 2-A, 2-B at PDF 8, 10 (emphasis added). That description provides more than adequate notice that it was the impact and disruption caused by his cell phone communication that were the basis for the charge and resulting discipline.

W.C.P.'s own written statements further confirm that that he understood the content of his communication, and resulting disruption, were the basis for the charge. He admitted to "produc[ing] a list of negative words relating to JF lacrosse players," and wrote: "I feel worst for whos [*sic*] trauma I caused to resurface that was completely out of mind when making [the list], and I should have reconsidered or at least been more empathetic . . . I also apologize to the parents that had to read the negative things about their sons . . . ." Id. at ¶ 6, Ex. 2-B at PDF 14. This reflection on the incident from W.C.P. shows that he knew the consequences he was facing were due to the impact of his cell phone communication and the disruption it caused, not that sole fact that he used a cell phone in violation of school policy.

Much of Plaintiffs' TRO submission feigns something like surprise at the fact that the Disciplinary Committee issued a suspension at all. See Mot. at 10–11 ("notice of one charge, a cell phone policy violation," and had "no opportunity to defend"). The large-font heading of the notice Plaintiffs received—"Notice of ***Long-Term Suspension Recommendation***," and notice that "long-term suspension for up to 364 days …" was being recommended, can put the claimed surprise to rest. Sumner Decl. Ex. 2-B at PDF 8 (emphasis added).

"Courts, for good reason, impose minimal due process requirements on the kinds of routine school discipline matters that school administrators confront every day." Starbuck v. Williamsburg James City Cnty. Sch. Bd., 28 F.4th 529, 538 (4th Cir. 2022). As Plaintiffs note,

the School Board may satisfy due process requirements via "oral or written notice of the charges." See Goss, 419 U.S. at 573–76. Here, it provided both oral and written notice of the charges to W.C.P.—written through the description in the Behavior Detail Report, Notice of Long-Term Suspension, and orally through the hearing. The description of the incident and the impact on the school community has been consistent from the beginning, when the Behavior Detail Report was issued.

The Fourth Circuit's decision in Starbuck v. Williamsburg James City County School Board is instructive. In that case, the plaintiff alleged a due process violation based on the School Board's "shift in its description of the reason for his suspension." See Starbuck, 28 F.4th at 537. The School Board had originally stated the plaintiff was being suspended due to concerns about his personal safety and potential threats to the school, but ultimately finalized his suspension as based upon the prevention of classroom disturbance. The Court found that the School Board did not violate the plaintiff's due process rights because "both parties always understood what particular speech constituted the basis for [the plaintiff's] short-term suspension." See id. The Court found that the School Board afforded the plaintiff an opportunity to explain his version of events and attempt to place his conduct in the proper context, just as the School Board has done here. See id. Ultimately, the Court held that the plaintiff's arguments "incorrectly blur[red] the line between labels and substance" because "[f]rom the beginning, [the plaintiff] had notice of the facts giving rise to his discipline and an opportunity to respond—exactly what due process requires." See id. at 537–38.

Just as in Starbuck, as the documentary evidence makes clear, W.C.P. has received more than adequate notice that his disciplinary charge was based on the substance and impact of his cell phone communication, and the disruption caused by that communication. There was no

"unconstitutional bait-and-switch," because "both parties always understood what particular speech constituted the basis for" W.C.P.'s suspension, and because "[f]rom the beginning, [W.C.P.] had notice of the facts giving rise to his discipline and an opportunity to respond." See Starbuck, 28 F.4th at 537. Indeed, this Court has previously rejected a request for emergency relief to reinstate a student in his senior year from a 45-day suspension (also due to an inappropriate text message), finding that the student had not shown a likelihood of success on similar procedural due process argument, when, as here, the "record . . . clearly showed that Plaintiff appreciated, understood, acquiesced and participated in the appeal to the School Board." *See Merkey v. Bedford Cnty. Sch. Bd.*, No. 6:10-cv-20, Final Order (W.D. Va. June 8, 2010) (Dkt. 15).

Plaintiffs' arguments that the School Board violated Virginia statutes and School Board policies (which again, are meritless), do not help them show a procedural due process violation in any event. That is because "[v]iolations of state law or school procedures are insufficient by themselves to implicate the interests that trigger a federal due process claim." Kowalski v. Berkeley Cnty. Schs., 652 F.3d 565, 576 (4th Cir. 2011) (cleaned up); see also J.S. ex rel. Duck v. Isle of Wight Cnty. Schs., 362 F. Supp. 2d 675, 684 (E.D. Va. 2005) (explaining that "violation of a school's policy is not prima facie evidence of a constitutional due process violation," and similarly a "violation of state law, in and of itself, does not implicate due process concerns").

Where, as here, Plaintiffs were on ample notice of the substance and factual basis for the charges against them and had a meaningful opportunity to respond and be heard, any technical failure in the notice to not include additional school board policy citations for the violation falls

far short of establishing a denial of Constitutional procedural due process. Plaintiffs are therefore unlikely to succeed on the merits.[5]

2. *W.C.P.'s Allegations of Irreparable Harm Are Undemonstrated, and Overstated.*

Plaintiffs argue that W.C.P. will suffer "irreparable harm" by suffering an injury "measured in school days that cannot be relived." Mot. at 12. But in this emergency posture, it is Plaintiffs' burden to "clearly establish" "the likelihood of irreparable harm to the movant if the TRO is denied." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). Here, Plaintiffs cite six paragraphs in their Verified Complaint to support their demonstration of irreparable harm. Most of those concern things that have already happened. Compl. ¶¶ 25, 34. Indeed, the only statements made that concern forthcoming injury in the Complaint are that he has been harmed by "the exclusion from his school and its activities," and that "Home Educational Services placement is not an adequate substitute for in-person instruction at E.C. Glass High School during the final year of high school." Id. ¶¶ 33, 36. That's it. Plaintiffs don't describe, much less substantiate, how Home Educational Services is inadequate, or how W.C.P.'s exclusion "from his school and its activities" will impact him.[6] That is not to say W.C.P.'s experience will be the same with Home Educational Services as it would be at school. But Plaintiffs need to show not just a different educational program, but irreparable harm caused by the alternate program. See Barnett v. Tipton Cnty. Bd. of Educ., No. 07-cv-2055, 2007 WL 9705990, at *4 (W.D. Tenn.

---

[5] Plaintiffs' procedural due process claim under the Virginia Constitution fails for the same reasons. See Fairfax Cnty. Sch. Bd. v. S.C., 827 S.E.2d 592, 597 (Va. 2019) ("Procedural due process protections afforded under the Constitution of Virginia are coextensive with those of the federal constitution, and thus, the corresponding provisions of the Virginia Constitution go no further than their federal counterparts.") (cleaned up).

[6] Plaintiffs do not cite as a basis for their TRO any concern about a long-term suspension being subject to disclosure on college applications. Compl. ¶ 35; Mot. at 12–13.

Feb. 13, 2007) (finding that plaintiffs had not shown that student "would suffer irreparable harm by leaving the private school he is currently attending and attending the [alternative learning center] for the balance of the school year"). At bottom, Plaintiffs' arguments about harm are heavy on the rhetoric ("… each practice, each game occurs once," Mot. at 12), but light on evidence supporting the claim (… what practice, what game?).

On the other hand, Plaintiffs acknowledge, as they must, that the School Board has taken substantial steps to *minimize* the risk of harm to W.C.P. occasioned by his suspension, even allowing him to sit for four Advanced Placement (AP) exams on school property in May 2026. Compl. ¶ 32. Plaintiffs' delay in filing for this emergency relief until 90 days after the challenged School Board decision, and 42 days since they first brought suit, is another factor that weighs against a showing of irreparable harm. See Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75, 80 (4th Cir. 1989) (explaining that "a particular period of delay" may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction" and so the movant's "delay is thus quite relevant to balancing the parties' potential harms").[7] Plaintiffs have not shown irreparable harm absent the Court's issuance of a TRO.

3. *The Balance of the Equities & Public Interest Weigh in School Board's Favor*

Finally, Plaintiffs must demonstrate that the "balance of equities tips in the movant's favor," and that "the public interest is furthered by a TRO." Winter, 555 U.S. at 20. These factors

---

[7] Courts have found comparable delays undermined a showing of irreparable harm. E.g., Dotmar AI Inc. v. J.D. Irving, Ltd., No. 5:14-cv-58, 2014 WL 1800795, at *3 (E.D.N.C. May 6, 2014) (holding that six-week delay after filing complaint, and two-month delay from challenged termination of employment, "supports a finding that they are not suffering an irreparable harm"); Static Control Components, Inc. v. Future Graphics, LLC, No. 1:16-cv-730, 2007 WL 1447695, at *3 (M.D.N.C. May 11, 2007) (holding that "delay of 8 to 12 weeks" undermined showing of irreparable harm).

may overlap and are often considered together when the government is opposing a motion for a TRO or preliminary injunction. Belle Garden Estate, LLC v. Northam, No. 7:21-cv-135, 2021 WL 1156855, at *7 (W.D. Va. Mar. 26, 2021). Plaintiffs fare no better at proving these elements of their request for relief.

There is no real dispute about W.C.P.'s conduct: that he solicited information for his "chirp" list, that he wrote it down; that he posted it on Snapchat, sending it to three people at Jefferson Forest, who sent it to others, who sent it to more.[8] There is no dispute about what W.C.P. wrote. And there can be (and is, on this record) no dispute about the facts of the disruption W.C.P.'s conduct caused, and its effects to W.C.P.'s team, school, and community. Faced with proceeding with the boys' lacrosse game under circumstances that were a virtual tinderbox due to W.C.P.'s conduct, E.C. Glass and LCS's administration jointly decided the game had to be postponed, and it was later treated as "forfeited," and LCS determined that two later lacrosse games were with Jefferson Forest required a greater security presence and planning as a result. Despite Plaintiffs' after-the-fact and unsupported attempts to minimize the impact of W.C.P.'s actions (saying the games happened "without incident," Mot. at 13–14), these decisions fall well within the experience of the competent school administrative officials and are entitled to deference. See Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 440 (4th Cir. 2013) ("As long as school officials reasonably forecast a substantial disruption, they may act to prevent that

---

[8] W.C.P. has asserted that he did not want his "chirp" list distributed more widely than the three recipients. That assertion is not credible and need not be credited, as it belies common sense and is contradicted by his own contemporaneous statements. W.C.P. wrote on the top of the page, "JF chirps," i.e., Jefferson Forest "trash talk." They're not "chirps" or "trash talk" if not communicated. W.C.P. also admitted that he "produced [this] list of negative words relating to JF lacrosse players … to 'match' what [he] felt has been communicated in this rivalry." I.e., he intended the list to "match" what he felt JF players had communicated to them. See Sumner Decl. Ex. 2-B at PDF 12, 14.

disruption without violating a student's constitutional rights, and we will not second guess their reasonable decisions."); New Jersey v. T.L.O., 469 U.S. 325, 339–40 (1985) ("maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures").

Moreover, the School Board Disciplinary Committee acted well within their purview to assess these facts, and the character letters and statements W.C.P. submitted on his behalf, to determine that proper discipline required a long term suspension—not of 364 days, as initially recommended, but of 90 days. The School Board is charged with "supervision of schools," and certain "decisions regarding the safety and welfare of students are manifestly a part of the suppervisory authority granted the school boards" under the Virginia Constitution. S.C., 827 S.E.2d at 597, and its Discipline Committee charged with considering requests for long-term discipline within the City. Their decision is entitled to deference. See Starbuck, 28 F.4th at 538 ("Courts, for good reason, impose minimal due process requirements on the kinds of routine school discipline matters that school administrators confront every day."); S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cnty., 819 F.3d 69, 77 (4th Cir. 2016) ("school administators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student bullying or harassment"); cf. S.C., 827 S.E.2d at 597 (stating that "[a] well-deserved measure of deference . . . must be factored into" judicial review considering whether school board action is arbitrary and capricious under state law). And especially where, as here, Plaintiffs have not demonstrated any likelihood of success on the merits, "issuance of [a TRO] is not in the public interest, as [it] would be disruptive to the educational process and the public school system in general." See J.S. ex rel. Duck, 362 F. Supp. 2d at 685.

Plaintiffs have put forward no reason, much less a "clear showing," that the balance of equities and public interest support overturning that decision.

* * *

Plaintiffs fail to establish any, much less all, of the Winter factors required to support invocation of emergency relief by this Court. Plaintiffs' request for a TRO should be denied.

Dated: August 17, 2026.

Respectfully submitted,

By: /s/ Robert A. DeRise

Robert A. DeRise (VSB No. 78431)
WOODS ROGERS VANDEVENTER
BLACK, PLC
828 Main Street, 19th Floor
Lynchburg, Virginia 24504
Phone: (434) 846-9119
Fax: (434) 846-0337
robert.derise@woodsrogers.com

Jamie H. Wood (VSB No. 97297)
WOODS ROGERS VANDEVENTER
BLACK, PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24011
Telephone: (540) 983-7785
Facsimile: (540) 427-7479
jamie.wood@woodsrogers.com

*Counsel for Defendant*
*Lynchburg City School Board*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 17, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a copy to all counsel of record.

/s/ Robert A. DeRise
Robert A. DeRise